IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-02156-RBJ

LISA BARKER,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

This matter is before the Court on review of the Commissioner's decision denying plaintiff Lisa Barker's application for disability insurance benefits pursuant to Title II of the Social Security Act.  Jurisdiction is proper under 42 U.S.C. § 405(g).

### STANDARD OF REVIEW

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citations omitted).  Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ms. Barker first applied for disability insurance benefits on October 21, 2010. She claimed inability to work since her alleged onset date of November 4, 2008 due to protrusion between L4 and L5, damage to her spinal column from a C-section, posttraumatic stress disorder, muscular pain syndrome, and nerve damage from a spinal injury. R. 148. The Commissioner denied Ms. Barker's application on January 7, 2011. Ms. Barker then requested a hearing before an administrative law judge (ALJ), and the ALJ conducted a video-conference hearing on October 19, 2011. On December 16, 2011, ALJ Mary F. Withum issued an opinion denying benefits. The Appeals Council denied Ms. Barker's request for review on June 14, 2013. Thereafter, Ms. Barker filed a timely appeal with the United States District Court for the District

of Colorado.  According to findings made by ALJ Withum, Ms. Barker continues to remain insured through September 30, 2014.[1]  R. 17.

## BACKGROUND

Ms. Barker's claimed disability began on November 4, 2008 when she was placed on bed rest due to a pre-term labor pregnancy.  R. 36–37.  Since delivering via C-section Ms. Barker has complained of muscular pain syndrome, neurological issues in her legs and feet, headaches, limited spinal motion, a protrusion between L4 and L5 of her spine, and hearing loss.  In addition, Ms. Barker suffered from an assault by a co-worker in 1998.  Some of Ms. Barker's physical symptoms stem from this incident, and she also suffers from posttraumatic stress disorder ("PTSD") as a result.  Ms. Barker has been prescribed medications for both her physical pain and her mental impairments.  Her most recent work was as an operations manager at a Sports Authority retail store.  R. 149.

### Medical Evidence

In October 2008 Ms. Barker was in her second trimester of pregnancy.  R. 553.  At an annual maintenance evaluation performed at Banner Occupational Health Services ("Banner Health")[2] Ms. Barker complained of minimal pain with palpation over the neck, upper anterior chest wall, and shoulders bilaterally.  *Id.*  Upon examination she showed no acute distress, nor did she exhibit any pain behavior.  *Id.*  Examination revealed full and nontender range of motion in the cervical spine and full and equal range of motion throughout her extremities.  *Id.*

---

[1] The Field Office Disability Report of October 27, 2010 lists  Ms. Barker's date last insured ("DLI") as September 30, **2010**.  *See* R. 145.  Because the DLI is not determinative of the outcome of this appeal and because the question was not raised by the parties, the Court has not further investigated the DLI date. However, the Court recommends that this date be examined on remand, as it could affect the evidence considered and the ultimate outcome of the case.

[2] Ms. Barker received an annual maintenance evaluation from Banner Health stemming from a Workers Compensation claim from an injury sustained in the 1998 assault at work.  *See* R. 548–53.

In or around November 2008 Ms. Barker was put on medical leave from work because of pre-term contractions.  R. 262.  She underwent a successful cesarean section requiring spinal anesthesia on January 15, 2009 and was discharged from the hospital two days later.  R. 273–75, 277–78.

On April 8, 2009 Ms. Barker was examined for deep vein thrombosis upon complaint of left leg and lower extremity pain.  R. 279.  No evidence of thrombosis was found.  *Id.*  Ms. Barker was then referred to physical therapy, R. 281, and she participated in eight visits through May 14, 2009, *see* R. 295.  Although she exhibited some slow improvements Ms. Barker continued to complain of pain from nerve irritation in her lower extremities.  R. 295.

In June 2009 Ms. Barker's treating gynecologist declined to issue a requested letter of leave to Ms. Barker's employer, instead recommending treatment and diagnosis by a neurologist. R. 400.  On July 1, 2009, board certified neurologist Michael F. Hehmann, M.D., examined Ms. Barker for complaints of foot, back, and posterior leg numbness and tingling subsequent to her cesarean section.  R. 254–55.  The examination revealed normal strength in all muscles tested and intact nerves but documented symptoms at the upper lumbar area L1-2 and tingling and numbness in the posterior aspect of the legs and feet in an L5-S1 distribution.  *Id.*  Dr. Hehmann recommended an MRI scan before further treatment.  R. 255.  Two days later, on July 3, 2009, Ms. Barker admitted herself to the emergency room at Montrose Hospital complaining of severe headache, blurred vision, and nausea.  R. 298.  She was discharged in good condition with a prescription of high dosage ibuprofen.  R. 299.

Ms. Barker underwent an MRI in August 2009 which revealed disc desiccation at L4-5 with mild loss of disc space height.  R. 315.  It showed posterior bulging of the disc annulus with annual fissure, but no focal disc herniation.  *Id.*  It also revealed mild facet hypertrophy.  *Id.*

Reviewing the MRI in September 2009, Dr. Hehmann noted that Ms. Barker's symptoms were consistent with L4-5 disc desiccation (a common form of degenerative disc disease resulting from dehydration of the disc material). R. 253. Dr. Hehmann reported that on exam Ms. Barker had normal straight leg raising, normal reflexes, and normal strength in the lower extremities; however she had decreased range of motion to the back. *Id.* He recommended physical therapy for four to six weeks, at which point he would reevaluate her. *Id.* Ms. Barker attended eleven physical therapy sessions from September 2, 2009 through December 11, 2009. *See* R. 316.

On September 15, 2009 Ms. Barker sought medical treatment from Banner Health, two months earlier than her typical annual checkup, due to a significant increase in pain and an onset of lumbar pain, bilateral leg numbness, and tingling extending into her feet since the delivery of her child. R. 549. Upon exam, range of motion was full and equal in the upper extremities, and neurological evaluation was normal. *Id.* Cervical range of motion was full, though Ms. Barker complained of serious pain at the end points of rotation and lateral flexion. *Id.* She was instructed to follow up in one year for maintenance evaluation. *Id.*

During a November 2009 appointment with Dr. Hehmann Ms. Barker exhibited improved symptoms as well as improved strength and reflexes at the knees and the ankles. R. 252. Ms. Barker exhibited a slight decreased range of motion to the back and had very mild difficulty with her gait. *Id.* Ms. Barker reported that since January 2009 she had been unable to work due to inability to sit or stand for greater than an hour. *Id.* Dr. Hehmann recommended that Ms. Barker continue her home exercise therapy "and hopefully she will continue to improve." *Id.* He noted that he "think[s] she will continue to improve with her moderate to severe radiculopathy, left-sided greater than right, at L4-5." *Id.*

Ms. Barker continued with physical therapy, completing her twenty-sixth session on January 26, 2010.  R. 357.  The physical therapist noted that Ms. Barker's complaints did not correspond directly to the L4 disc diagnosis, and she recommended discontinuing physical therapy treatment since "[t]reatments appear to give patient mild temporary relief but no long term improvement."  *Id.*  Yet just a month later in February 2010 Dr. Hehmann reinstated the physical therapy order.  R. 350.

At a March 10, 2010 appointment with Dr. Hehmann Ms. Barker reported being unable to stand for more than two or three hours and difficulty with prolonged sitting due to pain.  R. 251.  Upon exam, she exhibited a decreased range of motion to the back, significant pain on palpation, and positive straight leg tests bilaterally.  *Id.*  In June 2010, Dr. Hehmann observed that Ms. Barker had a "considerable amount of spasms" in her back, pain, decreased range of motion, positive straight leg raising, and "pain down bilaterally in an L4-5 distribution."  R. 250.  He prescribed Flexeril (10mg half a tablet every six to eight hours as needed) and temporarily discontinued physical therapy.  *Id.*

In a follow-up appointment in September 2010 Dr. Hehmann observed that Ms. Barker was "doing fairly well with her symptoms," but that she had experienced "an episode where she went to the zoo with her son . . . and had increasing symptoms."  R. 249.  She also reported having "had burning and decreased range of motion with pain and spasm in the low back."  *Id.*  Dr. Hehmann prescribed Celebrex (200mg a day) and recommended a "continued conservative approach."  *Id.*  During the following December 2010 examination Dr. Hehmann described Ms. Barker as having chronic back pain, chronic left-sided shooting pain, and occasional right-sided pain.  R. 515.  Ms. Barker reported problems with walking and difficulty lifting up her child because of her lower back pain and other pain symptoms.  *Id.*  On exam she showed decreased

range of motion to the back, trace reflexes at the knees and at the ankles, and mildly positive straight leg raising on the left side. *Id.* Dr. Hehmann prescribed Aleve and Flexeril. *Id.*

Ms. Barker saw Cathy Smith, M.D., at her maintenance check-up with Banner Health in December 2010. Ms. Barker complained of increased severity and frequency of headaches, continued neck pain, and more left-sided pain with occasional pain radiating into the left arm. R. 548. She rated her pain that day as fluctuating between a 4/10 at best and a 9/10 at worst. *Id.* She also reported a new diagnosis of hypertension with blood pressure as high as 210/104 at times. *Id.* On exam, Ms. Barker had a normal gait and full cervical range of motion, but she complained of pain with bilateral lateral rotation and looking down. *Id.* Pain was also reported with direct palpation over the left occiput, left upper neck, left scalenes, and left supraclavicular space. *Id.* Finally, Ms. Barker reported severe pain over the upper anterior chest wall and along the left scapular border. *Id.* No pain was reported with direct palpation or manipulation of the bilateral shoulders. *Id.* Grip strength was equal bilaterally, and sensation was intact throughout. *Id.* Dr. Smith recommended a CT scan and continued treatment through acupuncture, strengthening (health club membership), pain medication, and work restrictions (such as maximum lift of 35 pounds, repetitive lift of 20 pounds). *Id.*

In April 2011, at her next appointment with Dr. Hehmann, Ms. Barker continued to complain of chronic lower back pain and chronic pain down the legs impacting her ability to pick up her child and causing her "difficulty just 'getting through the day.'" R. 514. Yet Dr. Hehmann reported that Ms. Barker was doing better, and he noted that she tries to ride her bicycle and exercise through walking regularly. *Id.* On exam Ms. Barker had positive straight leg raising bilaterally, decreased range of motion to the back, and increased tenderness in the lower back. *Id.* She had normal reflexes in the upper and lower extremities. *Id.*

A month later, in May 2011, Ms. Barker reported moderate to severe back pain and lower back pain with spasms, tingling, and numbness sensations. R. 506. She stated that she had difficulty with loading the dishwasher and difficulty playing with her child because of the lower back pain, which is "a midline pain that extends down to the hips bilaterally." *Id.* On exam she had decreased range of motion to the back and a "significant amount of pain" on palpation at the lower back. *Id.* Her reflexes and motor exams were within normal limits. *Id.* Dr. Hehmann opined that Ms. Barker "fulfills disability criteria for her low back pain and symptoms involving chronic neuropathic pain at L4-5 bilaterally." *Id.* He also noted that although Ms. Barker had been prescribed pain medications, they "have just not worked very well." *Id.*

At a July 2011 examination Dr. Hehmann again reported that Ms. Barker was "doing fairly well" but noted that she was "having difficulty with fatigue and weakness"; showed signs of depression; suffered from bilateral hip pain, lower back pain, and pain down both of her legs; and had difficulty walking up and down stairs. R. 513. On exam, she showed decreased range of motion to the back, lower back pain, and symptoms bilaterally down through her legs. *Id.* Dr. Hehmann prescribed Oxycodone (5 mg) to try and relieve her pain symptoms. *Id.* At Ms. Barker's August 2, 2011 examination Dr. Hehmann noted the array of other health issues Ms. Barker had been experiencing, including a recent hospitalization for pancreatitis and dehydration in which Ms. Baker suffered from abdominal pain, nausea, vomiting, and diarrhea. R. 512. He also reported her chronic back pain, chronic neck pain, and symptoms in the upper and lower extremities, with regular Oxycodone use. *Id.* However, he refrained from prescribing another round of pain medications, writing "I am not sure about her pain medications" and noting that it might not be appropriate for him to write another prescription for Oxycodone because Ms. Barker was scheduled to see another physician, Dr. Lee, in regards to her abdominal issues. *Id.*

In September 2011 Ms. Barker was seen by Larry Tice, M.D., of the Kokopalli Pain Clinic.  R. 616–17.  Upon exam, Ms. Barker showed a slightly diminished range of motion in her neck, with some pain tilting and rotation towards the left.  Her Spurling sign, however, was negative.  R. 617.  In examining her back, Dr. Tice found that she had some interscapular tenderness.  *Id.*  She also demonstrated a fair range of motion; she would flex and bring her hands below her knees, but extension, tilting, and rotation bothered her moderately.  *Id.*  Ms. Barker's sacroiliac joints were both tender but moved normally, and straight leg raising caused discomfort though Dr. Tice found the pain "not terribly significant" based on the normal range of motion.  *Id.*  The examination revealed no evidence for lumbar radiculopathy or neurological dysfunction, but was consistent with abnormalities resulting from the L4-5 disc bulge.  *Id.*  Upon examination of Dr. Hehmann's records, Dr. Tice wrote that he "totally agree[s] with the diagnosis and management of Dr. Hehmann, and I did encourage [Ms. Barker] to continue with his advice."  *Id.*  He suggested that Ms. Barker undergo a second lumbar MRI to see if there has been "progression of the disk" and to get bending x-rays of her back.  *Id.*  He did not see any reason for surgery at that time but suggested "following conservatively as Dr. Hehmann has done."  *Id.*  Dr. Tice also recommended treatment for Ms. Barker's PTSD and acknowledged the complexity of Ms. Barker's condition.  *Id.*

Ms. Barker began treatment with psychologist Abigail Lang, Ph.D., in September 2011.  R. 596–99.  Dr. Lang diagnosed Ms. Barker with PTSD (chronic) and major depression (recurrent and severe).  R. 599.  She also found that Ms. Barker had a GAF score of 44.[3]  Throughout her sessions with Dr. Lang, Ms. Barker cried, demonstrated poor memory and

---

[3] GAF stands for Global Assessment of Functioning.  A GAF score of 41–50 indicates "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 34 (4th Ed. 1994) ("DSM-IV').

concentration, and was self-depreciative, irritable, impatient, and self-defensive.  R. 598; *see also* R. 603–08.

Dr. Lang completed a mental Residual Functional Capacity ("RFC") Assessment form in October 2011 in which she noted marked limitations in Ms. Barker's ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  R. 610–11.  Dr. Lang indicated that she had sufficient information to determine that Ms. Barker's limitations began in November 2008.  R. 611.  Records dated October 5, 2011 from psychiatrist Paula Trautner, M.D., support Dr. Lang's analysis.  *See* R. 637–39.  Dr. Trautner noted that "[a]t this point [Ms. Barker] would be considered significantly disabled by her psychiatric as well as physical symptoms."  R. 639.  Dr. Trautner prescribed Cymbalta (gradual increase from 20mg to 60mg over two weeks) to address Ms. Barker's pain intolerance, depression, and anxiety.  *Id.*

Dr. Hehmann examined Ms. Barker in September and November of 2011.  R. 635–36. His notes from November 2011 show that a second MRI revealed a mild amount of disc abnormality at L4-5 but no disc herniations in that area.  R. 635.  On exam Ms. Barker's sensation, motor, and coordination were unremarkable, and she had pain in an L4-5 distribution. *Id.*  Dr. Hehmann noted that no changes were warranted at that time, that Ms. Barker was "doing

fairly well" and was stable with her medications, and that she should follow up in four to five weeks.  *Id.*

On March 8, 2012 Dr. Hehmann conducted another exam of Ms. Barker, reporting that she was "really struggling with her chronic pain and symptoms."  R. 634.  He found that she had decreased range of motion to the back and chronic pain, and "moved very slowly secondary to her painful symptoms."  *Id.*  Dr. Hehmann noted that Ms. Barker continued to see Dr. Lang and Dr. Trautner for psychological treatment.  *Id.*  Dr. Lang completed a second Mental RFC Assessment on July 16, 2012.  R. 620.  She noted that Ms. Barker had marked limitations in the same categories as before with a few additions: (1) the ability to perform activities within a [unintelligible] maintain regular attendance, and be punctual within customary tolerances and (2) the ability to respond appropriately to changes in the work setting.  R. 620–21.  She based her assessment on a number of sources, including twenty-four individual sessions with Ms. Barker that lasted 60–90 minutes each and a 120-minute consultation with Mike Barker, Ms. Barker's husband.  R. 627.

**Reported Limitations**

During the October 19, 2011 administrative hearing the ALJ asked Ms. Barker to discuss her typical day.  Ms. Barker testified that once she wakes up, she comes downstairs and lies down on the couch.  R. 44.  After that, she prepares breakfast for her son, and "he just plays around with me . . . .  And that's pretty much what I do all day, you know.  Take care of his little needs and read books to him and lay on the couch."  *Id.*  She added that she does "light cleaning here and there" in "small increments."  *Id.*  For example, "I'll cook breakfast and then I'll lay around, then I'll wash those dishes.  And then I, you know, lay around and get up and I'll try and sweep the floor or, you know, that's kind of how my day goes every day."  *Id.*  She testified that

she can work in 15–30 minute increments depending on how badly her legs hurt that day.  R. 54.

Ms. Barker takes a pain pill before dinner "so I can stand there a half-hour because by that time

my legs really hurt because I bend up and down, up and down."  R. 47.[4]  Ms. Barker has about

two good days a week, and on those days she "can sweep the floor and do the breakfast dishes,

and maybe get in a load of laundry . . . ."  R. 55.  Her husband helps by carrying heavier items

for her, such as moving the laundry up and down the stairs and taking out the vacuum cleaner.

R. 44.  Ms. Barker also noted that she limits her driving to trips to the grocery store and to

doctor's appointments due to pain in her neck.  R. 37.  Ms. Barker indicated in her December 10,

2010 Function Report that she has no problem with personal care such as dressing bathing, and

feeding herself.  R. 169.  She does not need reminders to take care of her personal needs and

grooming or to take her medicine.  R. 170.  She prepares food and meals daily for about 30

minutes at a time.  *Id.*

    Ms. Barker testified that she could stand or sit for approximately thirty minutes before

needing to lie down.  R. 48, 50.  She said that when she climbs stairs in her home, by the time

she gets to the top "my legs are so tired they feel like they're going to collapse.  I'll have to stop

and hold on to the wall for a minute and do a few deep breaths to make sure I'm not going to go

down."  R. 49.  Ms. Barker testified that stooping and kneeling were difficult, however crawling

"doesn't seem to bother me."  *Id.*  She said she could lift 20 to 25 pounds, the weight of her son

at the time.  R. 50.  She also stated that she suffered from myofascial pain syndrome and daily

headaches stemming from the 1998 assault by a co-worker.  R. 39–40; R. 51.  In her Function

Report she indicates that she used to take part in a large variety of physical activities (sports, dirt

biking, rollerblading, and hiking, to name a few) but that "all activities have pretty much been on

---

[4] Notably, she made a similar observation about her leg pain in her December 2010 Function Report, stating that "by the time we eat dinner my legs hurt so bad I just want to cry." *Id.*

hold" since her pain symptoms began, noting that "[t]he only thing I do is watch TV."  R. 172.

She said that she can still camp if she's in a trailer with all amenities, but that she "cannot hike or

walk but a short distance."  *Id.*  Since her symptoms started she hasn't participated much, if at

all, in social activities because of her leg and back pain.  R. 173.

The ALJ asked Ms. Barker to describe her current pain symptoms.  Ms. Barker reported

experiencing "pain bilaterally in both legs to the bottom of my feet.  And then sensations,

stabbing knives sensations" ever since the birth of her youngest son.  R. 42.  She said that her

"feet don't bend, flex right, you know, they hurt to where they don't have like a flexion on

them."  R. 42–43.  She added that now she experiences "numbness to my left palm, most of, you

know, every day.  At times I can't open a car door or hold anything in my left hand without

dropping it."  R. 43.  Further, she said that she feels "pain right above my waistband" and that it

spreads from the "lower back and then it goes, it's a little sharper on the left side sometimes, like

the sciatica."  R. 45.  She also described neck pain that "feels like I have two rods down the

middle of my spine."  *Id.*

The ALJ asked Ms. Barker to describe what if anything helps to alleviate her pain.  Ms.

Barker responded that she goes to the hot springs and soaks her legs, noting that "it doesn't

relieve the pain, but it relaxes my muscles a little bit from being so tense."  *Id.*  She said that the

pain pills also help, and that she has a medical marijuana prescription, but that "nothing takes

away the sensations, you know.  I can mask the pain a bit, cover it up for a while, but the

sensations don't go away."  R. 45–46.[5]  Finally, she said that she went to physical therapy for a

year and a half but that it "just exacerbated the pain, it made it worse."  R. 45.

---

[5] Ms. Barker has also stated that she cannot afford to fill her medical marijuana prescription as much as
she would like. R. 57.

Notably, Ms. Barker filled out a personal pain questionnaire as part of her disability benefits application. The questionnaire describes similar amounts of pain in similar areas of her body and is dated December 10, 2010. Ms. Barker wrote that her "illness changed my life. I used to walk, stand, do outdoor sports. Now I am in pain 24 hours a day. I only live to lie down. I make breakfast, and lie down[;] put laundry in, lie down. I am in bed by 7:30pm because I just can't stand or walk. I can't sleep because of pain." R. 167. In her Function Report Ms. Barker wrote that her "illness limits my ability to work because I cannot sit, stand, or walk without pain. [Pain] level just increases until I lie flat." R. 168. She wrote "the pain is so severe and the sensations keep me from falling asleep and I wake up 5 to 6 times moaning and rolling around my legs touching each other hurt too bad to get comfortable." R. 169. In particular, she noted that she cannot squat, bend, stand, walk, sit, kneel, or climb stairs "without pain that gets greater. Sharper, stabbing sensations[,] weakness, numbness in back & legs, feet." R. 173.

As to her mental conditions, the ALJ asked Ms. Barker what symptoms she experiences from her post-traumatic stress disorder. Ms. Barker testified that she is "really aware of who is around me, who is looking at me, who is following me. I worry that people are going to come and kill me, rape me." R. 47. She added that she "feel[s] like I have to protect myself all the time." *Id.* She also worries about the safety of her older children. R. 47–48. Upon questioning by her attorney Ms. Barker testified that she had difficulty sleeping and has had panic attacks. R. 56. She also said that she had "horrible" concentration and memory. R. 53.

### **Denial of the Claim**

The Social Security Administration uses a five part process to determine whether a claimant qualifies for disability insurance benefits. 20 CFR § 404.1520. At **step one** the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §

404.1520(a)(4)(i).  The ALJ found that Ms. Barker had not engaged in substantial gainful activity since her alleged onset date of November 4, 2008.  R. 17.

At **step two** the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that are "severe."  20 CFR § 404.1520(a)(4)(ii).  The ALJ found that Ms. Barker suffered from the following severe impairments: degenerative disc disease, hearing loss, depression, and posttraumatic stress disorder.  R. 17.  The ALJ found that the following impairments were non-severe: occipital neuralgia, pancreatitis, and hypertension.  R. 17–18.

At **step three** the ALJ must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings").  20 CFR § 404.1520(a)(4)(iii).  The ALJ determined that none of Ms. Barker's impairments—alone or in combination—met or medically equaled one of the listed impairments in the Listings.  R. 18–19.

Before reaching step four, the ALJ is required to determine the claimant's residual functional capacity ("RFC").  *See* R. 16; 20 CFR § 404.1520(a)(4)(iv).  An RFC represents "the most [a claimant] can still do despite [her] limitations."  20 CFR § 404.1545(a)(1).  The RFC is "the claimant's maximum sustained work capability."  *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).  The ALJ found that Ms. Barker has an RFC to perform light work as defined in 20 CFR § 404.1567(b) except a sit/stand option allowing the claimant to sit or stand alternatively at will provided the claimant is not off task for more than 10% of the work period; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, kneel or crawl; limited to occupations that do not require fine hearing capability or frequent telephone communication; employed in a low stress job with only occasional decision making required and

only occasional changes in the work setting; work is limited to 1- or 2-step tasks; and only occasional interaction with the public, coworkers, or supervisors.  R. 19–20.

At **step four** the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past work.  20 CFR § 404.1520(a)(4)(iv).  The ALJ found that Ms. Barker could no longer perform past relevant work.  R. 25.

At **step five** the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience.  20 CFR § 404.1520(a)(4)(v).  A Vocational Expert ("VE") testified at the October 2011 administrative hearing that a hypothetical individual who was the same age as Ms. Barker with the same work experience and RFC could perform light work, such as a small products assembler (10,000 jobs in the national economy), R. 62, and could perform sedentary jobs such as an addressing clerk (20,000 jobs in the national economy), a document preparer (20,000 jobs in the national economy), and a touch up screener (45,000 jobs in the national economy), R. 63.  The VE testified that her answers were consistent with the Dictionary of Occupational Titles (DOT), except for the sit/stand option (one of the RFC limitations), which was based on the VE's personal knowledge and experience.  R. 63–64.  Relying on this testimony, the ALJ found that Ms. Barker would be able to perform the requirements of representative occupations such as an addressing clerk, a document preparer, and a touch-up screener, all of which are unskilled and sedentary, and which exist in significant numbers in the national economy.  R. 26.

## ANALYSIS

Ms. Barker, through counsel, raises five issues on appeal.  She claims that: (1) the ALJ failed to properly include all of her limitations as found in the RFC Assessment in the

hypothetical questions to the VE; (2) the ALJ failed to include all of her impairments when

assessing her RFC; (3) the ALJ failed to properly evaluate the opinion of her treating

psychologist, Dr. Lang, or, in the alternative, the Appeals Council improperly failed to consider

Dr. Lang's July 2012 opinion; (4) the ALJ failed to properly consider her subjective complaints

and credibility; and (5) the Commissioner failed to meet her burden of proof at Step Five.

### A. Hypothetical Questions to the Vocational Expert.

Hypothetical inquiries to the vocational expert "must include all (and only) those

impairments borne out by the evidentiary record." *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.

1995). Ms. Barker contends that in the hypothetical inquiry put to the VE, the ALJ erroneously

failed to include the limitation that Ms. Barker could be off task up to 10% of the work day due

to the "sit/stand" option. Ms. Barker is correct. Though the ALJ presents the "sit/stand" option

in the hypothetical, there is no mention of Ms. Barker needing to be off task for 10% of the

workday. On review, this Court cannot be certain that the VE would have identified the same

jobs, if any, should the hypothetical have described all of Ms. Barker's limitations, including

being off task up to 10% of the time.

### B. RFC Assessment.

Ms. Barker next contends that the ALJ erred by failing to include her non-severe

impairments in the RFC Assessment. An ALJ must consider all of the claimant's medically

determinable impairments (including those which are not "severe") when assessing a claimant's

RFC. *See* 20 CFR § 404.1545(a)(2). Ms. Barker argues that the ALJ failed properly to assess

her physical RFC by not considering all of her impairments, in particular her occipital neuralgia,

neck pain, and frequent headaches. She also argues that the ALJ improperly adopted some but

not all of Dr. Lang's mental limitations without explanation, thereby failing to make sufficiently

detailed findings with respect to Ms. Barker's mental RFC.

17

In regards to Ms. Barker's occipital neuralgia, neck pain and headaches, the ALJ did not explicitly address these symptoms in her RFC determination. Yet Ms. Barker has not shown how accounting for these symptoms would alter her RFC. As to her headaches, she is not permitted to have frequent telephone communication and is only allowed occasional interaction with other individuals. In regards to her neck pain, Ms. Barker can only occasionally stoop, crouch, kneel, or crawl. Finally, ALJ Withum noted that Ms. Barker worked full-time for eight years after being diagnosed with occipital neuralgia, suggesting that the symptoms did not impair her ability to work. Taking these limitations into consideration, the Court finds that the failure to specifically take into account these non-severe symptoms probably did not affect the outcome of the RFC.

Next, Ms. Barker argues that the ALJ failed properly to include all of her mental limitations in the RFC Assessment, contending that Dr. Lang's opinion was not given proper weight because the ALJ only adopted some of Dr. Lang's opinions. "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). So long as the ALJ's determination is based on substantial evidence in the record, it will not be found to be erroneous due to a failure to fully adopt the opinion of one or more medical providers. In this case, the ALJ included Ms. Barker's depression and PTSD as severe impairments at step 2 of the analysis. R. 17. The ALJ also found that Ms. Barker suffered from moderate restrictions in her activities of daily living and in maintaining concentration, persistence, and pace along with marked limitations in social functioning. R. 18–19. The ALJ gave sufficient explanations to support these findings. *See id.* Taking these limitations into consideration, the ALJ found that Ms. Barker must be employed in a low stress job with only

occasional decision making required and only occasional changes in the work setting; work must

be limited to 1- or 2-step tasks; and Ms. Barker could only have occasional interaction with the

public, coworkers, or supervisors.  The Court finds that ALJ Withum properly considered Ms.

Barker's mental limitations and incorporated those limitations in the RFC Assessment.

### C. Opinion of Treating/Examining Physician.

Ms. Barker's next argument is that the ALJ failed properly to evaluate the October 2011

mental RFC Assessment form filled out by Dr. Lang, or, in the alternative, that the Appeals

Council should have considered Dr. Lang's July 2012 mental RFC Assessment form.

"[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must

complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v.*

*Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  "The initial determination the ALJ must make

with respect to a treating physician's medical opinion is whether it is conclusive, i.e., is to be

accorded 'controlling weight,' on the matter to which it relates." *Id.*  (citing *Watkins v.*

*Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).  The opinion must be given controlling weight

if "it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and

is not inconsistent with other substantial evidence in the record." *Id.*  (citing *Watkins*, 350 F.3d

at 1300; 20 CFR §§ 404.1527(d)(2), 416.927(d)(2)).  If the opinion is deficient in either of these

respects, it should not receive controlling weight.  *Id.*

If a medical opinion by a treating physician is not given controlling weight, it is still

entitled to deference and must be weighed using the factors provided in 20 CFR §§ 404.1527 and

416.927.  *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)).

Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship, including the treatment provided and the

kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)). Although an ALJ should consider all of these factors, it is not necessary that he explicitly discuss every factor. *Oldham*, 509 F.3d at 1258. However, the ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).

After considering these factors, the ALJ "must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons . . . for the weight assigned." *Krauser*, 638 F.3d at 1330. "[T]he ALJ's findings must be 'sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reason for that weight.'" *Id.* at 1331 (citation and alterations omitted).

In regards to the October 2011 mental RFC Assessment form, the ALJ noted that (1) the treatment visits had been "relatively infrequent" between Dr. Lang and Ms. Barker; (2) Ms. Barker alleged an onset date of 2008 but first sought mental health treatment in 2011; and (3) Dr. Lang only treated Ms. Barker for less than a month before opining that she could not work. R. 24. Further, Dr. Lang avowed she had "sufficient information" to find that Ms. Barker's symptoms first presented themselves in November 2008, the same month as Ms. Barker's alleged onset date, even though she only began treating Ms. Barker in September 2011. R. 23, 611. In turn, the ALJ rejected Dr. Lang's opinion that Ms. Barker was unable to work due to disability, but gave "limited weight to the treatment notes" of Dr. Lang. R. 23–24. In particular, the RFC "accommodates the limitations noted by the treating doctors and treating facilities" and

the ALJ "limit[ed] the claimant to a range of light work based on my review of the totality of the record including the claimant's subjective complaints." *Id.*

Ms. Barker argues that "the ALJ improperly chose those portions of the medical evidence favorable to [her] position, while ignoring other evidence." [ECF No. 17 at 40]. Ms. Barker cites *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007) for the proposition that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." 482 F.3d at 1208. The Court agrees with Ms. Barker that the ALJ was incorrect in describing her treatment as infrequent during the month of September 2011. In addition, any suggestion that Ms. Barker's failure to receive mental health treatment in 2008 precludes her from having had suffered from PTSD would be erroneous. As plaintiff's counsel points out, Ms. Barker's psychological impairments could have certainly interfered with her ability or motivation to seek psychological treatment. [*See* ECF No. 17 at 45]. However, these errors are not fatal. In spite of the ALJ's misgivings she gave noticeable weight to Dr. Lang's opinion when making her RFC Assessment. She appeared to qualify Dr. Lang's opinions solely by Ms. Barker's self-reported activities. In particular, Ms. Barker was able to work through November 2008, a decade after her traumatic experience occurred; she needed to stop work because of a complicated pregnancy, not for mental health reasons; and she is able to care for her young child without assistance. R. 24–25. Further, the Court shares ALJ Withum's misgivings regarding how quickly Dr. Lang opined on Ms. Barker's mental RFC and how she presented Ms. Barker's limitations as having begun in November 2008. After a thorough review of the record and of the ALJ's opinion, the Court finds that the ALJ provided sufficient reasons for giving limited instead of controlling weight to Dr. Lang's opinion and that there is substantial evidence supporting the ALJ's determination.

Ms. Barker's second argument is that the Appeals Council failed properly to consider Dr. Lang's July 2012 mental RFC Assessment, which was submitted several months after the ALJ rendered her decision. Yet the Appeals Council explicitly stated that it considered this additional evidence when making its determination. *See* R. 1–2, 4. Upon review, the Appeals Council found that "this information does not provide a basis for changing the Administrative Law Judge's decision." R. 2. The Court has also reviewed the July 2012 mental RFC Assessment and finds that it does not provide a basis for reversing the ALJ on the substantial evidence standard this Court is bound to follow.

Finally, Ms. Barker makes no argument that the ALJ gave improper weight to Dr. Hehmann's opinion. As such, the Court has not reviewed this matter on appeal.

**D. Credibility Determination & Subjective Complaints.**

Next, Ms. Barker contends that the ALJ failed to base her credibility determination on substantial evidence. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). However, these determinations "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* Ms. Barker argues that a number of factors were inappropriately considered or inaccurately assessed when the ALJ made her credibility determination: (1) Ms. Barker's daily activities; (2) the extent to which she required rest; (3) the side effects of her medications; (4) her reasons for leaving work; and (5) her level of pain at the hearing.

A claimant's statements alone are not enough to establish disability. 42 U.S.C. § 423(d)(5)(A); 20 CFR § 404.1528(a). But the Commissioner cannot ignore those statements as they often provide some of the best evidence of pain and other physical limitations. Therefore

the ALJ must evaluate the credibility of the claimant's testimony where that testimony could influence the ultimate finding of disability.  20 CFR § 404.1529(a).  In this case, the ALJ concluded that Ms. Barker's testimony regarding the limiting effects of her impairments was not credible to the extent it conflicted with the RFC Assessment.  R. 21.  This Court has discussed the foregoing boilerplate language and has noted that it can be problematic "'when it appears in the absence of a more thorough analysis.'"  *Lloyd v. Colvin*, No. 12-CV-3350-RBJ, 2014 WL 503765, at *9 (D. Colo. Feb. 6, 2014) (quoting *Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013)).  Unfortunately, that is precisely was happened in this case.

The ALJ failed to discuss Ms. Barker's subjective complaints.  Though there is a generally thorough discussion of the medical evidence in the record and, within that, a catalogue of some of the subjective complaints made by Ms. Barker, the ALJ does not specifically discuss Ms. Barker's Function Report or her hearing testimony.  In turn, it appears that Ms. Barker's subjective complaints regarding the limitations in her daily activities and the extent to which she required rest might not have been taken into account.  In addition, the side effects of her medications were not discussed.  Further, the ALJ found that Ms. Barker suffered from an "apparent lack of discomfort during the hearing" and gave this factor "some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations . . . ."  R. 21.  Yet Ms. Barker started kneeling during the hearing, explaining that "my butt is aggravated, my back is aggravated.  So I just need to change positions, get off my seating."  R. 51.  If the ALJ thought that his was "just for show," and had some basis for that suspicion, fine; but there was no such indication.  Upon review of the decision, the Court agrees that the ALJ failed to consider Ms.

Barker's subjective complaints, particularly her daily activities, the extent to which she required

rest, the side effects of her medications, and her level of discomfort at the hearing.[6]

In making a more complete and explained analysis of Ms. Barker's subjective complaints

on remand, the ALJ should take into account the following guidelines.  First, an ALJ must

consider the claimant's daily activities in assessing the credibility of her claim of disability.  20

CFR § 404.1529(c)(3)(i); *Hamilton v. Sec'y of Health & Human Services of U.S.*, 961 F.2d 1495,

1499 (10th Cir. 1992).  However, the "sporadic performance [of household tasks or work] does

not establish that a person is capable of engaging in substantial gainful activity."  *Frey v. Bowen*,

816 F.2d 508, 516–17 (10th Cir. 1987).  Second, the ALJ is required to take into account a

number of other factors when making her credibility determination, including (1) the location,

duration, frequency, and intensity of the claimant's pain or other symptoms; (2) precipitating and

aggravating factors; (3) the type, dosage, effectiveness, and side effects of medication taken to

alleviate the pain or other symptoms; and (4) any measures used to relieve the pain or other

symptoms (including lying down).  *See* 20 CFR § 404.1529(c)(3).  Further, it is not enough to

simply write that these factors have been considered, but instead the findings as to credibility

must be "closely and affirmatively linked to substantial evidence" in the record.  *See Kepler v.*

*Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

### E. Burden of Proof at Step Five

For her final argument Ms. Barker contends that the Commissioner failed to meet her

burden of proof at step five.  The Court agrees that the burden of proof was not met insofar as the

ALJ erroneously failed to include being off task for up to 10% of the work day in her

---

[6] As the Court has noted earlier, a negative inference could be made regarding Ms. Barker leaving work in November 2008 due to a complicated pregnancy and not for her arguably disabling symptoms.  However, the ALJ is not limited to finding Ms. Barker disabled as of November 2008; so long as she is found to be disabled before her date last insured, she can still claim benefits.

hypothetical to the VE. The Court also anticipates that the ALJ will reconsider her step five analysis after delving into the issues presented on remand. As such, no further discussion of the burden of proof at step five is required at this time.

**F. Improper Inferences.**

One part of the ALJ's opinion troubles me enough to comment on it. At the end of her discussion of her reasons for rejecting the opinions of both Dr. Hehmann and Dr. Lang, two of Ms. Barker's treating physicians, the ALJ wrote:

> The possibility always exists that the doctors may express an opinion in an effort to assist a patient with whom they sympathize for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs from the rest of the evidence of record, as in the current case.

R. 24. I do not doubt that a treating physician would wish to be supportive of his or her patient, and there are reported cases that have noted the same. But that does not mean, at least to me, that the opinions are necessarily tainted. These are, after all, medical professionals. Unless there is more than speculation on which to rely, I am prepared to believe that while a doctor might present his or her opinions in the most helpful way, the doctor does so within the bounds of his or her professional obligation to provide bona fide and accurate assessments and opinions not only to the patient but to third parties such as in a Social Security investigation.

In my view, therefore, statements like the one quoted above might lead to an improper misevaluation of the treating physicians' opinions as well as of a claimant's subjective symptoms (or the appearance of same). A reasonable inference here is that Ms. Barker or the doctors or all of them are exaggerating or misrepresenting her condition. The claimant is put at a disadvantage if an ALJ presumes that she must have swayed the hand of her doctor instead of taking into

account that both the claimant and her doctor could agree that her subjective symptoms are real even if the objective medical evidence does not fully support such a finding.

It might be that the ALJ had good reason to suspect that the opinions were not entirely candid, although they were not expressed in the order.  I do not include these comments necessarily as a criticism of the ALJ.  I simply note that one must be cautious about saying anything that arguably deprecates the good faith of the physician without good cause.

## ORDER

The case is REVERSED and REMANDED to the ALJ for further findings consistent with this opinion.  The ALJ is further instructed to make a new finding as to Ms. Barker's date last insured.

DATED this 23rd day of June, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge